FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

97 DEC 24  AM 11: 22

U.S. DISTRICT COURT
N.D. OF ALABAMA

STEPHEN DIRK STOWE,                    )
                    Plaintiff;         )
                                       )
-vs.-                                  )          No.  CV 95-P-2866-S
                                       )
JEFFERSON COUNTY BOARD OF              )
EDUCATION, et al.,                     )
                    Defendants.        )

ENT[...]

DEC 2 4 1997

**OPINION**

Plaintiff's remaining claims[1] are based on allegations that—by not allowing him to sell and display

Confederate flags and related merchandise at the 1993 and 1994 Leeds Area Business Fairs—the Jefferson

County Board of Education and the Greater Leeds Area Chamber of Commerce violated his rights under the

First and Fourteenth Amendments to the Constitution.[2]  Pending before the court, after extensive briefing

and oral argument, are three motions for summary judgment: one by the Board of Education and its

Superintendent, H. Bruce Wright; a second by the Chamber of Commerce and its Executive Director, Sonya

Miller; and a third (for partial summary judgment) by the Plaintiff.

I. Facts.

In November 1993, the Greater Leeds Area Chamber of Commerce organized and sponsored a

Business Fair to promote the City of Leeds and its businesses.  The Chamber arranged with the Jefferson

County Board of Education to use the Leeds High School lunchroom for the fair.  Use of the school

lunchroom for the fair was conditioned upon the sponsor's agreeing to abide by the regulations of the Board,

one of which was a policy requiring students to refrain from language or activity intended to insult or

stigmatize others on the basis of their sex, race, handicap, religion, sexual orientation, or national or ethnic

---

1. Previously dismissed by stipulation were plaintiff's claims against the City of Leeds, its Mayor, the members of its City Council, and the members of the Chamber's Board of Directors.  Also dismissed by stipulation were breach of contract claims.

2. Plaintiff also made claims under the Fourth and Fifth Amendments.  These are clearly without merit.

origin.

The plaintiff, Stephen Stowe, was at the time operating in Leeds a business known as Southern Flag and Novelty. Stowe's business sold, among other items, Confederate flags and memorabilia. Stowe submitted a timely application to participate in the 1993 fair, paid a registration fee, and signed a contract to rent space at the fair. Concerned about Stowe's participation, Sonya Miller, the Chamber's Executive Director, conferred by telephone with the Board's Superintendent, Bruce Wright, about the potential display of Confederate merchandise at the fair.

There is a factual disagreement between Miller and Wright regarding the details of this conversation, and more particularly whether Miller on behalf of the Chamber was seeking permission to exclude Stowe's Confederate memorabilia from the fair, or whether Wright on behalf of the Board was requiring such exclusion, or whether they jointly decided to exclude the merchandise. In any event, after the conversation, Miller informed Stowe that he would not be able to display these items at the fair. Stowe later contacted Superintendent Wright, who confirmed that the Confederate items would not allowed at the school. When Stowe arrived at the school to set up for the fair, he was again told that he could not display his Confederate merchandise. Precluded from displaying and selling a large portion of his merchandise, Stowe withdrew his whole display from the fair.

The following year, Stowe discussed with Miller his participation in the 1994 fair. Miller informed Stowe that the 1994 fair would be open only to members of the Chamber. Stowe was not a member of the Chamber and did not submit any formal application to participate in the 1994 fair, nor did he make any effort to join the Chamber or participate in the fair.

## II. Analysis.

All Defendants are due to be granted summary judgment on Stowe's claims relating to the 1994 fair since his exclusion—to the extent he was in fact excluded—was based on lack of membership in the Chamber, a requirement imposed by the Chamber that does not implicate First Amendment rights.

2

### A. Claims against the Chamber.

Stowe's allegations against the Chamber and Miller with respect to the 1993 fair are that they violated his First Amendment rights—made applicable to state agencies through the Fourteenth Amendment, and also applicable to private persons who conspire with governmental officials to violate such rights. These claims are due to be dismissed to the extent the Chamber was the initiator and decision-maker respecting Stowe's exclusion from the fair. The fair was conceived and designed by the Chamber to make a collective point about the business climate of Leeds and is a form of private expression by the Chamber protected under the First Amendment. See *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 S. Ct. 2338 (1995). The Chamber, as a private non-governmental entity, has its own First Amendment rights—rights no less protected than Stowe's—to choose what message to convey through its expressive activities, like the fair. This freedom of expression includes the right to tailor its expression by choosing both what messages to convey and what messages not to convey. *Id.* at 2347.

The Chamber and Miller may be subjected to liability under 42 U.S.C. § 1983 if they conspired with school officials in a violation of Stowe's First Amendment rights and thereby became state actors. *Adickes v. Kress & Co.*, 398 U.S. 144 (1970). Because there is a genuine dispute of fact as to whether the Chamber was exercising its First Amendment rights and enforcing its own policies—even if intended to curry favor with the Board—or, on the other hand, was simply enforcing policies of the Board "under color of law," resolution of the motion by the Chamber and Miller depends upon an analysis of Stowe's claims against the Board.

### B. Claims against the Board.

Unlike the Chamber, the Board of Education, being a governmental agency, does not enjoy an affirmative First Amendment right to express its views by regulating the expressive content of the fair participants. *Rosenberger v. Rector & Board of Visitors of the Univ. of Va.*, 515 U.S. 819 (1995). Rather, First Amendment jurisprudence cuts the other way in the case of the Board, circumscribing its ability to limit expressive activities. A government's power to restrict protected First Amendment activity depends on the

3

nature of the forum and the nature of the restriction. *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473

U.S. 788, 800 (1985); *Ethredge v. Hail*, 56 F.3d 1324, 1326-27 (11th Cir. 1995); *Rosenberger*, 515 U.S. at

828; *Gay Lesbian Bisexual Alliance v. Pryor*, 110 F.3d. 1543 (11th Cir. 1997).

The Supreme Court has recognized three general types of forums: nonpublic forums, traditional

public forums, and designated public forums. *See, e.g., Perry Educ. Ass'n v. Perry Local Educator's Ass'n*,

460 U.S. 37, 45-46 (1983); *Crowder v. Housing Auth. of Atlanta*, 990 F.2d 586, 590 (11th Cir. 1993).

Designated public forums are those areas that are not traditional public forums, but that the government has

opened for use by the public as places of expressive activity. Although governments are not required to

create such forums, once they do so the Constitution constrains their power to regulate speech within the

forum. Designated public forums are governed by the same standards that apply in a traditional public

forum—reasonable time, place and manner restrictions are permissible, and content-based prohibitions must

be narrowly drawn to effectuate a compelling state interest. *Perry*, 460 U.S. at 46. A limited public forum

is a special subtype of a designated public forum, created when public property is designated as a forum for

public communication for a specific and limited purpose. In addition to the time, place, and manner

restrictions applicable to ordinary designated public forums, the State may place additional restrictions on

the limited forum's use in order to preserve its intended purpose so long as the regulation on speech is

reasonable and not an effort to suppress expression merely because public officials oppose the speaker's

view. *Perry* 460 U.S. at 46; *see also Widmar v. Vincent*, 454 U.S. 263 (1981).

In opening up the school cafeteria for the business fair, the Board created a limited public forum.

While public schools are not traditional public forums, the government may create a limited public forum

by making a nonpublic place available for "certain groups of speakers or the discussion of certain subjects."

*Crowder*, 990 F.2d at 591; *see also Widmar*, 454 U.S. at 269. When the Board opened the high school to

local businesses to display and promote their products on a school holiday, it created a limited public forum

for Leeds area businesses to discuss and promote their enterprises.

Having created a limited public forum, the Board subjected itself to constitutional standards

4

regarding the limitations it could impose on expression in that forum. As discussed, a government may place restrictions on the content of speech in a limited public forum that are reasonably calculated to preserve its intended purpose and are not efforts to suppress certain points of view. *Perry*, 460 U.S. at 46. In determining whether content-based limitations are permissible efforts to maintain the purpose of a limited forum or are impermissible regulations based on the ideology or perspective of the speaker, the Supreme Court has identified two types of limitations, *subject matter* discrimination and *viewpoint* discrimination. A subject matter limitation refers to a restriction based on the category or topic of expression. A viewpoint limitation is a restriction based on the ideology or orientation of the speaker with respect to the subject matter. These two types of limitations trigger different treatment under the First Amendment.

Subject matter discrimination is subject to a reasonableness standard, measured against the purpose of the limited forum. When a governmental body creates a limited public forum, it may exclude expression based on subject matter, provided the restriction is reasonable in light of the purpose to be served by the forum. *Rosenberger*, 515 U.S. at 829.

While governments may determine what subjects are appropriate for a limited forum, they may not, however, dictate the positions participants in the forum may take with respect to those subjects. *Pryor*, 110 F.3d at 1549. In contrast to the reasonableness standard applied to subject matter limitations, viewpoint limitations are presumed unconstitutional in a limited public forum. In general, government may not regulate speech in a limited public forum based on the viewpoint or orientation of the speaker if the content of the expression is otherwise within the scope of forum's limited subject matter. *Id.*; *Rosenberger*, 515 U.S. at 830. When the government targets not subject matter, but the particular views taken by speakers on the subject, a violation of the First Amendment is presumed. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

A decision by the Board to prohibit Stowe from displaying Confederate memorabilia would have been a presumptively unconstitutional act of viewpoint discrimination, rather than an exercise of permissible

5

subject matter discrimination. The Board had authorized this limited public forum for those from the area to discuss and portray the subject of Leeds area businesses. Accordingly, the Board could only have imposed restrictions for the purpose of preserving that specific subject matter. Stowe was a Leeds area businessman, and the Southern Flag and Novelty Company was a Leeds area business. The fact that Stowe was within the scope of the fair's limited subject matter is not in dispute. The Defendants acknowledge that Stowe's display was excluded because it contained Confederate flags, not because his company was not a Leeds area business. This prohibition was not a reasonable restriction designed to preserve the limited purpose of the fair. Here, Stowe's ideology was the rationale for his exclusion. The Board cannot exclude the presentation of certain viewpoints merely because it does not endorse those views.

Because of the compelling government interest in education, the Board could overcome the presumption of unconstitutionality if it could show that the restriction was reasonably related to the educational goals and policies of the school system. That is, notwithstanding the presumption against viewpoint restrictions, school officials may prohibit conduct that materially and substantially interferes with the educational process. *See Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 678 (1986). Courts ordinarily give substantial deference to educational decisions by school officials. Nevertheless, "when a particular decision implicating the First Amendment has no valid educational purpose, the First Amendment is so directly and sharply implicated as to require judicial intervention." *Searcy v. Harris*, 888 F.2d. 1314, 1319-1320 (11th Cir. 1989).

Superintendent Wright's belief that exclusion of Stowe's merchandise from the school cafeteria would serve a valid educational purpose and not violate Stowe's rights—though one which a school official could reasonably arrive at during the short period of time when a decision had to be made—cannot, in retrospect, be the basis for trumping Stowe's rights under the Constitution. Because the fair was held on a holiday when school was not in session, there was no danger of disrupting school operations. Because the fair was not a school sponsored activity, there was little danger of creating the appearance that the school endorsed the views of the exhibitors. The Board's policy against racially provocative materials may, in

6

general, be upheld as serving the legitimate objective of promoting racial harmony within the schools. But the relationship between that objective and any decision by Wright to exclude the Confederate memorabilia from the fair is too tenuous, in the opinion of the court, to justify the denial of Stowe's First Amendment rights, albeit a form of "commercial speech." For these reasons, and given the existence of evidence from which a jury could find that Wright made the decision to exclude Stowe's Confederate merchandise, the Board's motion is due to be denied.

### C. Qualified Immunity.

Superintendent Wright is due to be granted summary judgment on all claims against him in his individual capacity on the ground of qualified immunity, even if it was he, rather than the Chamber's Miller, who decided that Stowe's merchandise should be excluded. Wright was executing a discretionary function of his position as Superintendent of the Board in the discussions with Miller regarding the display of Confederate flags and memorabilia. Although the court has concluded that—depending on the identity of the decision maker—Stowe may have suffered a constitutional deprivation, this would not have constituted a violation of a clearly established constitutional right of which Wright should have been aware. *See Anderson v. Creighton*, 483 U.S. 635 (1987).

For like reason, Stowe's claims against Miller—which, on analysis, should be viewed as made against her in her "individual" rather than "official" capacity—should similarly be dismissed under the doctrine of qualified immunity. This court has not been referred to, and has not independently located, any decision addressing the availability of the qualified-immunity defense to private persons charged with conspiracy-based § 1983 claims. Logicially, however, it would appear that a conspiracy-based claim against a person like Miller could not be premised on her "official" capacity, but only against her in her "individual" capacity, and that, if treated as acting under color of law in concert with Superintendent Wright, she should be entitled to raise the qualified immunity defense no less than Wright. With Miller being entitled to dismissal based on qualified immunity, the respondeat superior claims against the Chamber should likewise be dismissed.

Neither the Board nor Wright in his official capacity can raise the qualified immunity defense. *See*

*Kentucky v. Graham,* 473 U.S. 159 (1985). However, since Stowe's only remaining claims are for damages—which would not be recoverable against Wright in his official capacity—the claims against Wright in his official capacity may also be appropriately dismissed.

### III. Conclusion.

With the granting of summary judgment in favor of Miller, the Chamber, and Wright, it follows that Stowe's motion for partial summary judgment, seeking a declaration of liability against those defendants, is due to be denied. Stowe's motion for partial summary judgment against the Board is due to be denied because a genuine issue of material fact exists; namely, whether the decision to exclude him from the 1993 fair was one made by Superintendent Wright to enforce Board policies or one made by Miller to foster the Chamber's policies.

Dated:   December 24, 1997

Chief Judge Sam C. Pointer, Jr.

Service List:
    Stephen D. Stowe
    Edward Still
    Burgin H. Kent
    Billy Ray Weathington

8